IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

v.

CRIMINAL NO.: 2:25-cr-278

LIANA BITTNER,

Defendant.

## DEFENDANT'S SENTENCING MEMORANDUM

AND NOW, comes Defendant, Dr. Liana Bittner ("Dr. Bittner"), by and through undersigned counsel and files, respectfully files this Sentencing Memorandum. In support thereof, averring as follows:

## I.     PRELIMINARY STATEMENT

On December 4, 2025, Dr. Bittner pled guilty to Count 1 of the above captioned Indictment, specifically, Receipt and Delivery of Misbranded Drugs, a misdemeanor offense in violation of 18 U.S.C. § 331(c). In doing so, Dr. Bittner waived her right to a jury trial and demonstrated his acceptance of responsibility and remorse in this matter. This memorandum does not seek to excuse the actions underlying Dr. Bittner's guilty plea. Rather, the purpose of this memorandum is to provide the full picture surrounding Dr. Bittner, her plea agreement, and the offense to which she pled guilty so that this Court may determine a fair and just sentence. As will be discussed below, Dr. Bittner takes responsibility for her actions, and now respectfully requests this Court accept her negotiated plea agreement.

## II.     LIANA BITTNER'S PERSONAL BACKGROUND

### A.     Family and Background

Liana Luba Bittner was born Luba Rogozovsky, on February 27, 1967, in Lvov (now Lviv in Western Ukraine), in the former Soviet Union. While still living in Lvov, she and her family were ostracized by other adults for being Jewish. In 1975, when Liana was eight, the family

escaped with assistance from the Jewish Federation. She remembers taking a train from the Soviet Union, through Austria, and arriving in Italy. At the time, she was the youngest of two daughters, but her mother became pregnant with a third child, while the family was staying in Italy. They stayed in Italy for 6 months, then were able to obtain a flight, again with the assistance of the Jewish Federation, to Pittsburgh. Pittsburgh was chosen as the family's destination because of the thriving Jewish community that existed in the Squirrel Hill neighborhood. The family stayed in Squirrel Hill until Liana was in fifth grade, at which point the family moved to Monroeville. She attended Gateway High School, graduating in 1985. While in school, Liana excelled academically and was heavily involved in extracurricular activities such as a forensics program, choir, and poetry club.

For as long as she can remember, Liana wanted more than anything to be a doctor. Unfortunately, her parents did not support this dream, telling her that she was not smart enough for medical school, and refusing to pay for college if that was the route she wanted to take. Coming from the Soviet Union, engineering was a much-preferred profession, and her parents informed her they would only pay for her college if she pursued a degree in engineering. Reluctantly, Liana went to the University of Pittsburgh and earned a degree in engineering. She graduated in 1990, with the degree, taking five years rather than four, "since her heart was not really in it." Right around the time she graduated, Liana started dating a physician and eventually moved in with him in Pittsburgh. Living with a physician gave Liana confidence that, contrary to what her family believed, she was smart enough to complete medical school and achieve her dream of being a doctor. With that realization, she went back to the University of Pittsburgh and obtained a degree in biology, graduating in 1995.

After taking the MCAT, Liana attended medical school at Hahnemann University in Philadelphia, which is now part of Drexel University. In 1998, she began her residency at Altoona

Hospital. Upon completion of her residency, she began working as a family physician at Uniontown Hospital.

Dr. Bittner worked at Uniontown Hospital for two years but maintained a desire to go out on her own. Her options in that regard, however, were limited because her employment contract with the Hospital prevented her from working in family medicine anywhere close to Uniontown. Moving elsewhere was not a viable option at that time as Liana had already married her husband Donald Bittner and started her family. She would not uproot her family for professional advancement. As a solution, Dr. Bittner decided to pursue a new practice area, so she could leave Uniontown Hospital, but still practice close to where she began her family. In 2003, Dr. Bittner began practicing emergency medicine, which she continued to do for over twenty years until the events that are the subject of this case. During that time, Dr. Bittner has worked at Highlands Hospital in Connellsville, Monongahela Valley Hospital in Monongahela, and Somerset Hospital in Somerset.

Liana and Donald Bittner met and got married while she was still in medical school. Liana describes Donald as a "blue collar guy" who worked contracting jobs, installing heating and air conditioning when they first met. In 1999, Donald suffered a fall from a tree, sustaining injuries that severely hindered his ability to do the physical work to which he had been accustomed. Donald now also works as a manager of a residential trailer park they invested in approximately six years ago.

The Bittner's have three children, Joseph (27) works in the computer technology field and has a degree from Pittsburgh Technical Institute. Rachael (25) is attempting to follow in her mother's footsteps and is a second-year medical student at Drexel. Finally, Victoria (23) has a film degree from the University of Pittsburgh and currently works as a chef at the Oaklander Hotel.

**B.      Physical and Mental Heath**

Despite having no diagnosed mental health disorders, for as long as she can remember, Dr. Bittner has struggled with issues related to her weight and body image. Her mother was hyper-critical of her on this issue throughout her childhood. In her interview with the probation office for the presentence report, Dr. Bittner reported that she and her sister experienced verbal, emotional, and physical abuse from her mother. She reported an incident when they were still living in the Soviet Union, when she dropped a watermelon in the grocery store and her mother verbally berated and threatened to leave her. She was only six years old at the time. Additionally, around the age of twenty, she remembers her mother threatening to kill her, while holding a knife.

Dr. Bittner believes this verbal and emotional abuse contributed significantly to what she acknowledges is an obsession with health and wellness, with a particular focus on combatting obesity and diabetes. Dr. Bittner has devoted her life to the practice of medicine, but her true passion is for helping others lose weight and live healthier lifestyles. As someone who was once overweight herself, she made it her mission to protect others from obesity and the litany of downstream health issues it causes.

**C.      Nature of the Instant Offense**

Tirzepatide is a medication that was originally used to treat type 2 diabetes, under the brand name Mounjaro. Mounjaro was approved by the Food and Drug Administration ("FDA") in 2022.[1]

In 2022, tirzepatide was FDA approved to treat chronic weight management and obstructive sleep apnea, under the brand name Zepbound.[2] With the FDA approval of Zepbound for weight loss in 2023, the use of tirzepatide and other GLP-1s for weight loss by patients who

---

[1] Eli Lilly and Company, *HIGHLIGHTS OF PRESCRIBING INFORMATION*, Food and Drug Administration, 2022, https://www.accessdata.fda.gov/drugsatfda_docs/label/2025/215866s039lbl.pdf (accessed March 27, 2025)
[2] SourceGLP1.com, *GLP-1 Timeline: Every FDA Approval from 2005 to Today*, December 2025, https://sourceglp-1.com/blog/glp1-fda-approval-timeline.html (accessed March 27, 2025)

are not diabetic has skyrocketed. The British Medical Journal, a peer reviewed medical journal intended for medical professionals, reported in 2024 that over the last four years, the United States has seen a 700% increase in usage.[3] And this finding includes years before Zepbound was FDA approved. This widespread usage of GLP-1s for weight loss has continued to increase drastically since and has become widely accepted both by medical professionals and in society, as advertisements for GLP-1s for weight loss have become undeniably commonplace. During the 2026 Super Bowl four drug companies, Novo, Lilly, Hims, and Ro, ran advertisements for GLP-1s, specifically marketing them to over 125 million people worldwide as a safe and effect weight loss drug. [4]

When Dr. Bittner first started seeing commercials for Ozempic and hearing about its effectiveness as a weight loss supplement, she was intrigued. She conducted her own research into tirzepatides for the management of weight loss and appetite control. After conducting this research and being satisfied with the safety and efficacy of the compound, she began obtaining tirzepatide from a company based in China for personal use. She did not need to use her medical license to obtain the tirzepatide.

Dr. Bittner began using the tirzepatide, with significantly favorable results, and no adverse side effects. Her friends and colleagues noticed the positive change and inquired into her methods at achieving such results. Because she was already buying the products in bulk, she offered to provide tirzepatide to her interested colleagues, asking only that they reimburse her for out-of-pocket costs. She provided her colleagues who wished to take the tirzepatide with a printed set of directions, which she had compiled from her research and personal experience using it safely and

---

[3] Mahase, Elisabeth, *GLP-1 agonists: US sees 700% increase over four years in number of patients without diabetes starting treatment,* The BMJ (British Medical Journal), July 23, 2024 https://www.bmj.com/content/386/bmj.q1645.full (accessed March 27, 2025)
[4] Niasse, Amina, *Weight-loss drugs to compete on biggest stage with Super Bowl ads,* Reuters, February 7, 2026, https://www.reuters.com/business/media-telecom/weight-loss-drugs-compete-biggest-stage-with-super-bowl-ads-2026-02-07/ (accessed March 27, 2025)

effectively. She did not provide medical advice to her colleagues but did advise them to comply with the instructions for use and administration. Being financially able to afford the upfront costs, Dr. Bittner was willing to do so for friends who were interested in losing weight in a way she found to be safe and effective, from personal experience. Having done her research and used the product herself with no negative side effects, she genuinely believed in the safety and efficacy of tirzepatide. From Dr. Bittner's perspective, she was someone who was helping friends lose eight in a safe manner, like someone who would promote vitamins and a wholistic lifestyle. Nonetheless, when she was asked to stop sharing tirzepatide by her employer, she did.

Dr. Bittner now has deep regret for providing tirzepatide to others in the manner that she did. She takes responsibility for that.

## III.    APPLICABLE SENTENCING GUIDELINES

### D.    Dr. Bittner's Guidelines Call for a Sentence of Probation

The parties stipulate that the base offense level, pursuant to § 2N2.1 of the Sentencing Guidelines, is 6. Additionally, the parties agree that the offense level should be increased by two levels, pursuant to § 3B1.3 of the guideline because of Dr. Bittner's position as a doctor. The parties agreed that if Dr. Bittner meets the U.S.S.G. § 4C1.1(a)-(2)-(11) criteria at the time of sentencing, which she has, she is entitled to a two-level reduction. Finally, United States agreed to recommend a two-level downward adjustment for acceptance of responsibility and, pursuant to U.S.S.G. § 3E1.1(a). After all applicable reductions and deductions are applied, the total offense level in this case is four. Dr. Bittner has a criminal history score of zero, placing her in criminal history category I. The guidelines for a criminal history category of I and a total offense level of four is zero-six months of imprisonment. Pursuant to Rule 11(c)(1)(c), the parties agreed that the appropriate sentence in this case is two years' probation, a fine in an amount to be determined by the Court, and a special assessment of $25.

**E.**     **18 U.S.C. § 3553(a) Factors**

As provided by statute, this Court must impose a sentence "sufficient, but not greater than necessary" to fulfill the purposes of sentencing. *See* 18 U.S.C. §3553(a). Section 3553(a) of Title 18 of the United States Code provides, in relevant part:

(a) Factors to be considered in imposing a sentence. The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider;

> (1)     the nature and circumstances of the offense and the history and characteristics of the defendant;

> (2)     the need for the sentence imposed:

>> (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

>> (B)     to afford adequate deterrence to criminal conduct;

>> (C)     to protect the public from further crimes of the defendant; and

>> (D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

**F.**     **Application of 18 U.S.C. § 3553(a)(1) – "The nature and circumstances of the offense and the history and characteristics of the defendant"**

The nature and circumstances of the circumstances of the offense are discussed throughout this memorandum. As for the history and characteristics of Liana Bittner, she is quite literally a living embodiment of the American Dream. She legally emigrated from the Soviet Union, a totalitarian communist regime that denied all its people political and cultural freedom. For Dr. Bittner and her family, however, life in the Soviet Union was even worse, as the regime openly carried out policies of religious oppression and antisemitism. The impact of that experience has reverberated with her personally and through her family for her entire life. The remainder of her upbringing after arriving in the U.S. was not easy, but she persevered. Through hard work, she has

become a physician, mother, and provider to a family of her own. She had to overcome significant obstacles, both personal and professional to get where she is today. Through it all, her intense obsession with health and wellness has been a defining characteristic of her life. The actions that brought her to this point, specifically the sharing of tirzepatide with friends and colleagues, was the outgrowth of her keen focus on and concern about obesity and desire to help others. She had done her research, used the product herself with positive results, and genuinely believed in the safety and efficacy of the product.

**G.      Application of 18 U.S.C. § 3553(a)(2)(A) – "The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"**

Dr. Bittner acknowledges the seriousness of this matter. Again, while the conduct at issue in this case stems from a sincere desire to help others, she understands the importance of the labeling, branding and prescription requirements for medications, including tirzepatide. It is believed that the penalty agreed to between Dr. Bittner and the government in this case is appropriately reflective of the seriousness of the offense in this case.

**H.      Application of 18 U.S.C. §3553(a)(2)(B) – "to afford adequate deterrence to criminal conduct"**

As previously mentioned, this matter and those related to her providing tirzepatide to others has had a substantial adverse impact on Dr. Bittner's life, health, and wellbeing. She was terminated from her job as an emergency department physician and still faces civil liability in a pending medical malpractice matter, for which insurance coverage has been denied. She also has entered into a Consent Order and Agreement by the Commonwealth of Pennsylvania Board of Medicine, which includes sanctions of a period of probation for 36 months and payment of a civil penalty of $7,500, which she has already paid. Under that Consent Order, she is also required to complete additional education and training on drug prescription and ethical decision-making. Given the sanctions already sustained, the conviction in this court, and the remaining risk of

substantial civil liability, it is respectfully submitted that that the goal of general deterrence has been effected by those consequences enumerated above. Regarding specific deterrence, for the reasons discussed above, the goal is already being met. Dr. Bittner desires nothing more than to move forward in a productive and lawful way in all aspects of her life.

**I.      Application of 18 U.S.C. § 3553(a)(2)(C) – "to protect the public from further crimes of the defendant"**

Dr. Bittner has no criminal history, and this incident is the first brush with law enforcement in her life. This matter weighs heavy on her conscience, including the concern for the impact on others. Based on her great regret, personal character, education level, age, and overall personal history, Dr. Bittner is statistically at an extraordinarily low level of likelihood of recidivism. She intensely wishes to just accept responsibility for her actions, peacefully serve a period of probation, and then move on with her life and career. It is respectfully submitted that this Court should feel no need to "protect the public from further crimes of the defendant" in this case.

**J.      Application of 18 U.S.C.. § 3572 - Imposition of a fine.**

As enumerated in the Defendant's position with respect to sentencing, Dr. Bittner respectfully disagrees with the characterization of her monthly cash flow by the probation office in the Presentence Investigative Report. ("PSIR") The PSIR calculates her monthly cash flow as $13,158.35. However, this figure excludes the monthly payments she makes on behalf of her daughter of $7,731.50 in tuition and room and board payment of $5,500. These expenses are considered "non-allowable" by the probation office, expenses as they are not necessary for the defendant's continued employment or for the basic health and welfare of the defendant and her dependents. But the exclusion of these monthly payments misrepresents the reality of her finances. The reality of her monthly cash flow is reflected in the statement she prepared, which accounts for the tuition payments, putting her monthly cash flow at $191.87. The amount of money she has available to her monthly, which is relevant to this Court's consideration of whether to impose any

9

fine. 18 U.S.C.A. § 3572 - Imposition of a sentence of fine and related matters, provides in relevant part:

> (a) Factors to be considered. --In determining whether to impose a fine, and the amount, time for payment, and method of payment of a fine, the court shall consider, in addition to the factors set forth in section 3553(a) –
> …
>
> **(2) the burden that the fine will impose upon the defendant, any person who is financially dependent on the defendant**, or any other person (including a government) that would be responsible for the welfare of any person financially dependent on the defendant, relative to the burden that alternative punishments would impose;

*See* 18 U.S.C.A. § 3572(a)(2).

The Court must consider the burden a fine will impose on not only the defendant but also "any person who is financially dependent on the defendant." *Id.* While she is over the age of eighteen and technically no longer a "dependent" legally, the reality is Dr. Bittner's daughter is financially dependent on her mother for these tuition payments. A fine that hinders Dr. Bittner's ability to pay tuition on her daughter's behalf would impose an undue financial burden on her daughter. Additionally, the burden a fine would impose on Dr. Bittner herself is not inconsequential. Her financial situation is incredibly precarious due to the looming civil lawsuit, which is entirely paying out of pocket, including the cost of any settlement or verdict against her. In addition, the full consequences to her employability following the issuance of the final judgment in this matter and the recent Consent Order by the Board of Medicine are not yet known.

## **CONCLUSION**

For the above stated reasons of law and fact, Dr. Bittner respectfully requests that this Court accept the negotiated plea agreement and sentence her to two years of probation. Dr. Bittner takes responsibility for her actions, is remorseful, and now wishes to put this incident behind her and move on with her life. Dr. Bittner asks this Court to view her with the fairness dictated by the

United States Constitution, 18 U.S.C. § 3553, and the United States Sentencing Guidelines, and

accept the negotiated plea agreement.

<div style="margin-left:50%">

Respectfully submitted:

KRAUS JENKINS PLLC

By:    */s/ James W. Kraus*
JAMES W. KRAUS, ESQUIRE (56881)
SAMUEL S. BEAVER (332044)
Counsel for Liana Bittner

428 Boulevard of the Allies, Suite 700
Pittsburgh, PA  15219
412-546-0781
jkraus@krausjenkins.com
sbeaver@krausjenkins.com

</div>

Date:   April 7, 2026